## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ADELE HOFFMAN, JENNIFER OSHIER and RHEA SABILE, individually and on behalf of all others similarly situated, | } } } **CLASS ACTION COMPLAINT** } } |
| Plaintiffs | } Civil Action Number: } |
| v. | } } **JURY TRIAL DEMANDED** |
| ALDI, INC. D/B/A LITTLE JOURNEY | } } |
| Defendant. | } |

Plaintiff Adele Hoffman, Jennifer Oshier and Rhea Sabile (collectively, the "Plaintiffs"), by and through their attorneys, individually and behalf of all others similarly situated, bring this action against ALDI, Inc. d/b/a Little Journey ("Defendant"). Plaintiffs allege the following based on personal knowledge as to their own acts and based upon the investigation conducted by their counsel as to all other allegations.

## INTRODUCTION

1.      Parents like Plaintiffs reasonably trust Defendant to sell baby food that is safe, nutritious, and free from harmful toxins. They certainly expect the food they feed their infants to not contain elevated levels of toxic heavy metals such as arsenic, lead, cadmium, and mercury—substances known to have significant and dangerous health consequences, particularly for infants.

2.      Defendant manufactures and distributes products through the trade name Little Journey, marketed exclusively for babies and young children. The Little Journey baby food products include rice rusk "stage 2" baby teething wafers intended for ages 6 months and up,

1

"stage 4" puffs intended for ages 9 months and up, and "stage 3" little munchers also intended for ages 9 months and up (referred to herein as the "Products").

3.     Unfortunately, the Products feature dangerous levels of arsenic, lead, cadmium, and mercury.

4.     Consumers lack the scientific knowledge and resources necessary to identify the Products as containing dangerous quantities of these toxins. Reasonable consumers therefore must and do rely on Defendant to honestly report what their products contain.

5.     Defendant knows that its customers trust the quality of its products and that they reasonably expect Defendant's products to be safe for consumption. It also knows that certain consumers seek out and wish to purchase premium baby foods that possess high quality ingredients free of toxins, contaminants, or chemicals and that these consumers will pay more for baby foods they believe possess these qualities than for baby foods they do not believe possess these qualities.

6.     As such, the Products' packaging centers on representations and pictures that are intended to, and do, convey to consumers that the Products possess certain qualities and characteristics that render them safe for infants and justify a premium price.

7.     No reasonable consumer seeing the Products' packaging would expect the Products to contain elevated levels of toxic heavy metals or other undesirable toxins or contaminants. Furthermore, reasonable consumers, like Plaintiffs, would consider the quantity of toxic heavy metals or other undesirable toxins or contaminants a material fact when considering what baby food to purchase.

8.     Defendant intended for consumers to rely on its representations, and reasonable consumers did in fact so rely.

9.      Defendant's conduct is deceptive, misleading, unfair, and/or false because, among other things, the Defendant failed to reveal that its Products include elevated levels of toxic heavy metals.

10.      Defendant's Products do not have a disclaimer regarding the presence of elevated levels of heavy metals or other undesirable toxins or contaminants that would inform consumers that the foods contain heavy metals and/or that heavy metals can accumulate over time in a child's body to the point where poisoning, injury, and/or disease can occur.

11.      Defendant's wrongful misrepresentatives and omissions allowed it to capitalize on, and reap enormous profits from, consumers who paid the purchase price or a price premium for contaminated baby food that was not sold as advertised.

12.      Defendant continues to wrongfully induce consumers to purchase its Products which are not as advertised or as customers would reasonably expect.

13.      Plaintiffs bring this proposed consumer class action individually and on behalf of all other members of the Class (as defined herein), who, from the applicable limitations period up to and including the present, purchased for use and not resale the Products.

## JURISDICTION, VENUE, AND GOVERNING LAW

14.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because: (i) there are 100 or more class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) Plaintiffs and Defendant are citizens of different states. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

15.      Venue is proper in this Court pursuant to 28 U.S.C. §1391, because Plaintiffs suffered injury as a result of Defendant's acts in this district, many of the acts and transactions

giving rise to this action occurred in this district, and Defendant conducts substantial business in this district and is headquartered in this district. Defendant has intentionally availed itself of the laws and markets of this district, and Defendant is subject to personal jurisdiction in this district

16.     This Court has personal jurisdiction over the Defendant because it is headquartered in this district, conducts substantial business in this judicial district, and intentionally and purposefully placed the Products into the stream of commerce within this district and throughout the United States.

## PARTIES

17.     Adele Hoffman is a resident of Michigan City, Indiana who purchased the Products for consumption and not resale.

18.     Plaintiff Rhea Sabile is a resident of Garden Grove, California who purchased the Products for consumption and not resale.

19.     Plaintiff Jennifer Oshier is a resident of Potsdam, New York who purchased the Products for consumption and not resale.

20.     Defendant is an Illinois corporation with its principal office in Batavia, Illinois. Defendant sources, distributes, and sells baby foods, including the Products via its brand Little Journey, throughout the United States.

## CLASS ACTION ALLEGATIONS

21.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals who purchased the dangerous Products during the proposed class period.

22.     Specifically, the Class and Subclasses that the Plaintiffs seek to represent is defined as follows:

**Nationwide Class**: All individuals who purchased, for use and not resale, the Products within the United States within the past four years.

**Indiana Subclass**: All individuals who purchased, for use and not resale, the Products within the State of Indiana within the past four years.

**California Subclass**: All individuals who purchased, for use and not resale, the Products within the State of California within the past four years.

**New York Subclass**: All individuals who purchased, for use and not resale, the Products within the State of New York within the past four years.

23.     Specifically excluded from the Class and Subclasses is Defendant and any and all of its respective affiliates, legal representatives, heirs, successors, employees, or assignees.

24.     This action has been brought and may properly be maintained as a Class Action under Federal Law and satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

25.     The members of the Class and Subclasses are so numerous as to render joinder impracticable. Upon information and belief, there are thousands of Products sold – most, if not all, of the purchasers of the Products are members of the Proposed Class and Subclasses. Upon information and belief, the size of the Proposed Class and Subclasses totals at least thousands of individuals.

26.     Upon information and belief, joinder of all of these individuals is impracticable because of the large number of Class Members and the fact that Class Members are likely dispersed over a large geographical area, with members residing throughout the United States.

27.     Common questions of law and fact exist as to all members of the Class and Subclasses, in that all members of the Class and Subclasses purchased the Products, which contain dangerous levels of toxic metals, from the Defendant.

28.     Plaintiffs' claims are typical of the claims of the members of the Class and Subclasses. Plaintiffs and all members of the Class and Subclasses sustained damages arising out of Defendant's course of conduct. The harms suffered by the Plaintiffs are typical of the harms suffered by the members of the Class and Subclasses.

29.     The representative Plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the Class and Subclasses. Plaintiffs have no interests that are adverse to the interests of the members of the Class and Subclasses.

30.     Plaintiffs have retained counsel with substantial experience in the prosecution of class action and consumer protection litigation. Plaintiffs' counsel has the resources, expertise, and experience to successfully prosecute this action against Defendant. Counsel for the Plaintiffs knows of no conflicts among members of the Class and Subclasses, or between counsel and members of the Class and Subclasses.

31.     This action, in part, seeks declaratory and injunctive relief. As such, the Plaintiffs seek Class Certification under Fed. R. Civ. P. 23(b)(2), in that all Members of the Proposed Class and Subclasses were subjected to the same policies, concealment, and actions of the Defendant. In short, Defendant acted on grounds generally applicable to all members of the Class and Subclasses.

32.     In addition to certification under Rule 23(b)(2), and in the alternative, Plaintiffs seek certification under Rule 23(b)(3). Common questions of law and fact exist as to all members of the Class and Subclasses and predominate over any questions that affect only individual member of the class. These common questions include, inter alia, the following questions:

a. Whether Defendant engaged in the conduct discussed herein;

b. Whether the Products contain dangerous levels of toxins;

c. Whether the presence of elevated levels of toxic metals is material to a reasonable consumer;

d. Whether Defendant placed the Products in the stream of commerce in the United States with knowledge of the elevated levels of toxins contained within;

e. Whether Defendant knew or should have known about the presence of elevated quantities of toxic metals and, if so, when Defendant became aware of their existence;

f. Whether Defendant knowingly failed to disclose the existence and cause of the elevated toxin levels;

g. Whether Defendant violated consumer protection statutes;

h. Whether Plaintiff and Class overpaid for the Products;

i. Whether Plaintiff and Class Members are entitled to damages as a result of Defendant's conduct alleged herein, and if so, the amount or proper measure of those damages; and

j. Whether plaintiff and Class Members are entitled to equitable relief, including but not limited to injunctive relief, including public injunctive relief as provided under Indiana and/or California law.

33. In the alternative to certification under Fed. R. Civ. P. 23(b)(3), Plaintiffs also seek partial certification under Fed. R. Civ. P. 23(b)(1) and Fed. R. Civ. P. 23(c)(4).

34. A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since joinder of all of the individual members of the Class and Subclasses is impracticable given the large number of members of the Class and Subclasses, and the fact they are dispersed throughout the United States. Furthermore, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the Class and Subclasses to redress the wrongs done to them. The cost to the federal court system of adjudicating thousands of individual cases would be enormous. Individualized litigation would also magnify the delay and expense to all parties and the court system. By contrast, the conduct of this action as a class action in this District presents far fewer management difficulties, conserves the resources of the parties and the court system, and protects the rights of each member of the Class and Subclasses.

7

35.     Upon information and belief, there are no other class actions pending to address the Defendant's flagrant endangerment of the public health of thousands of infants, even though upon information and belief the Defendant has maintained its dangerous and illegal practices for several years.

## Facts Applicable to the Class

36.     Arsenic, lead, cadmium, and mercury are toxic heavy metals whose ingestion poses risks to human health. Moreover, scientific studies and reports including those conducted and released by the United States Food and Drug Administration ("FDA") particularly point to the severe effects exposure to these heavy metals may have on young children and babies. The FDA states that children's "smaller body sizes and metabolism" leave them more susceptible to the negative impacts of the metals including on "neurological development."[1] There is no *safe* amount for a baby to ingest and the FDA, accordingly, launched a *Closer to Zero* campaign aiming to minimize exposure of these metals to babies and young children.[2] This campaign came in response to a report released by the U.S. House of Representatives about heavy metals found in popular baby foods.

37.     On February 4, 2021, the U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, released a report entitled, *Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury* (hereinafter "Report").[3] The Report exposed many of the largest name brand baby food

---

[1] FDA, *Metals and Your Food*, available at: https://www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food
[2] FDA, *FDA Releases Action Plan for Reducing Exposure to Toxic Elements from Foods for Babies, Young Children,* available at: https://www.fda.gov/news-events/press-announcements/fda-releases-action-plan-reducing-exposure-toxic-elements-foods-babies-young-children
[3] U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, *Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury*, available at:

manufacturers, part of a billion-dollar industry, of knowingly concealing dangerous levels of contamination in ingredients directly used in the production of their baby food products. It flags a causative relationship between exposure to arsenic, lead, cadmium, and/or mercury and severe, lasting impacts on babies and young children such as "permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior in children."[4]

38.     The Report revealed that contaminated ingredients along the supply chain were disregarded by certain manufacturers who, in releasing their contaminated final products, failed to safeguard and warn consumers of the concentrated presence of these toxic heavy metals. Federal limits on *safe* levels of heavy metal concentration in relation to baby food, as mentioned above, do not exist. However, for comparison, the Report states that the FDA sets adult limits for bottled drinking water "at 10ppb inorganic arsenic, 5 ppb lead, 5ppb cadmium, and the Environmental Protection Agency has capped…mercury…at 2ppb."[5] The subcommittee's Report goes on to describe the specific risks to children posed by each of these toxic heavy metals.

### *Arsenic*

39.     Arsenic's most notable impacts on young children's health include "respiratory, gastrointestinal, hematological, hepatic, renal, skin, neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children."[6] Though the FDA set a 10ppb limit for arsenic in water consumed by adults, some studies have

---

https://oversight.house.gov/news/press-releases/oversight-subcommittee-staff-report-reveals-alarming-levels-of-toxic-heavy
[4] *Id.*
[5] *Id.*
[6] Miguel Rodríguez-Barranco et al., Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis (June 1, 2013) (online at https://pubmed.ncbi.nlm.nih.gov/23570911/)

found notable detrimental effects to children at levels as low as 5ppb.[7] Whatever the level, there is no question about the scientific consensus that arsenic is unhealthy for human consumption, particularly for the most vulnerable among us, including children and babies.

*Lead*

40.    Similarly, the FDA mandated a 5ppb cap on lead allowable in drinking water on account of negative human health outcomes. In the same way arsenic poses a heightened risk to vulnerable populations, the FDA reports that,

> high levels of lead exposure can seriously harm children's health and
> development, specifically the brain and nervous system.
> Neurological effects from high levels of lead exposure during early
> childhood include learning disabilities, behavior difficulties, and
> lowered IQ.[8]

41.    Moreover, lead, unlike arsenic, is capable of accumulation in the body which means that unknowingly consuming even low amounts of the toxin over time may exacerbate already heightened risks.[9] The Report additionally expounds on various studies' evidence of permanent developmental delays in socialization and academic success as a result of lead exposure.

*Cadmium*

42.    Cadmium, much like lead, has been linked to decreased IQ, but also is found to have high correlations with increased instances of ADHD, especially in young boys.[10] The research on cadmium exposure and negative health outcomes for young children and babies in particular, has been nothing short of conclusive in revealing its severity. The FDA's limit of 5ppb

---

[7] Gail A. Wasserman et al., A Cross-Sectional Study of Well Water Arsenic and Child IQ in Maine Schoolchildren (Apr. 1, 2014) (online at https://ehjournal.biomedcentral.com/articles/10.1186/1476-069X-13-23)
[8] Food and Drug Administration, Lead in Food, Foodwares, and Dietary Supplements (online at www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-dietary-supplements)
[9] *Id.*
[10] U.S. House of Representatives Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform, *Baby Foods are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury,* available at: https://oversight.house.gov/news/press-releases/oversight-subcommittee-staff-report-reveals-alarming-levels-of-toxic-heavy

in adult drinking water appropriately flags this concern, though harmful exposure to children may

occur at even lower levels.

*Mercury*

43.     Finally, mercury exposure has known detrimental impacts on IQ as well and is

correlated with diagnoses of autism in children.[11] The Report notes that subjection to contact with

mercury, despite having been studied most often prenatally, has clear implications on the health of

any continually developing child out of the womb as much as in. The EPA's limit of 2ppb on

mercury in drinking water is the lowest allowable level of these four heavy metals and indicates

that minimizing mercury exposure at all levels is of the utmost importance.

## THE SALE OF BABY FOOD CONTAMINATED WITH HEAVY METALS IS A DECEPTIVE PRACTICE

44.     Each of the preceding paragraphs is incorporated by reference herein.

45.     Advertisements, packages, and labels should provide consumers with accurate

information as to the nature and quality of a product's contents and is essential to making informed

decisions. When a company misrepresents material information about a product, it is deceptive

and misleading to reasonable consumers.

46.     On its website and on every Products' packaging, Defendant prominently

represents that the Products are intended as safe and healthy snacks for babies and young children.

Nowhere on the label or description of the Products is there any indication that they would or could

be laced with elevated levels of toxic heavy metals, decidedly detrimental to a child's health and

well-being.

https://www.aldi.us/en/products/baby-items/food-snacks/detail/ps/p/little-journey-strawberry-banana-and-apple-rice-ru/

---

[11] Jia Ryu et al., *Associations of Prenatal and Early Childhood Mercury Exposure with Autistic Behaviors at 5 Years of Age:  The Mothers and Children's Environmental Health (MOCEH) Study* (Dec. 15, 2017) (online at www.sciencedirect.com/science/article/pii/S0048969717316479)





https://www.aldi.us/en/products/baby-items/food-snacks/detail/ps/p/little-journey-blueberry-puffs/

13



https://www.aldi.us/en/products/baby-items/food-snacks/detail/ps/p/little-journey-little-munchers-cheese/







15

47.     Independent laboratory testing of samples of the Products revealed elevated levels of toxins.

48.     The tested banana strawberry rice rusks contained 93.2 ppb arsenic, 10.2 ppb cadmium, and 2.4 ppb mercury. The blueberry puffs contained 62.3 ppb arsenic, 10.7 ppb lead, 60.4 ppb cadmium, and more than 1.8 ppb mercury. The white cheddar little munchers contained 11ppb arsenic and inexact amounts below 10 ppb of lead, cadmium, and mercury. Each of these levels are high enough to raise significant concern, see supra, and all are contrary to the prominent representations on the Products' packaging and in Aldi's advertising and promotional materials.

49.     Defendant's sale of the Products deceives consumers because the front of the packages tout the absence of any possibility that the Products could have inherent dangerous impacts on any child old enough to chew who may consume them. Moreover, the Products' packaging omits any mention that they contain elevated levels of these toxins. Defendant's advertising additionally deceives consumers by stating that the respective Products are "gentle," safe for any child who is "familiar with eating solid foods," generally pure without "artificial" flavors or colors, and specifically recommended for children "6+ months" or "9+ months." Moreover, nutritional values are delineated between "infants 0-12 months" and "children 1-3 years."

50.     Defendant's sale of the Products is particularly deceptive to reasonable consumers because there is no practical way for consumers to know prior to purchase that the Products are laden with heavy metals despite being marketed as safe, even and especially for babies.

## Facts Applicable to Named Plaintiffs

### I.   Plaintiff Hoffman

51.    Plaintiff Hoffman purchased the Products, specifically the Little Journey Blueberry Puffs, Little Journey Strawberry Apple Puffs, Little Journey Banana Puffs, Little Journey Veggie Little Munchers, Little Journey Apple Rice Rusks, and Little Journey Banana Strawberry Rice Rusks from local Aldi grocery stores.  Plaintiff Hoffman fed the Products to her two children, who are now five and seven years old, from approximately August 2017 to June 2021.  During this time frame, Plaintiff Hoffman generally fed the Products to her children a few times a day.

52.    Plaintiff Hoffman believed she was feeding her children healthy, nutritious food by feeding her children the Products. Due to the false and misleading claims and omissions by Defendant, Plaintiff Hoffman was unaware the Products contained any level of toxic heavy metals and would not have purchased the Products had that information been fully disclosed.

### II.   Plaintiff Sabile

53.    Plaintiff Sabile purchased the Products, specifically the Little Journey Little Munchers in Veggie and Cheese flavors, from local Aldi grocery stores. Plaintiff Sabile fed the Products to her youngest child, who is now four years old, from approximately January 2021 through February 2022. During this time frame, Plaintiff Sabile generally fed the Products to her child at least once a week and often more frequently.

54.    Plaintiff Sabile believed she was feeding her child healthy, nutritious food by feeding her child the Products. She fears that her youngest child will experience adverse health effects as a result of frequently consuming the Products for over a year. Due to the false and misleading claims and omissions by Defendant, Plaintiff Sabile was unaware the Products

17

contained any level of toxic heavy metals and would not have purchased the Products had that information been fully disclosed.

### III. Plaintiff Oshier

55. Plaintiff Oshier purchased the Products, specifically the Little Journey Little Munchers in the Cheese flavor, from local Aldi grocery stores. Plaintiff Oshier fed the Products to her youngest child, who is now four years old, from approximately June 2020 through December 2021. During this time frame, Plaintiff Oshier generally fed the products to her child at least once a week and often more frequently.

56. Plaintiff Oshier's child currently experiences gastrointestinal issues, which began around the same time she began feeding him the Products. In or around June 2020, her child became sick with bowel problems, which have persisted to this day. Plaintiff Oshier believes these gastrointestinal issues could be a result of feeding her child the Products, which contain toxic heavy metals. Due to the false and misleading claims and omissions by Defendant, Plaintiff Oshier was unaware the Products contained any level of toxic heavy metals and would not have purchased the Products had that information been fully disclosed.

## CAUSES OF ACTION

### COUNT I

### COMMON LAW BREACH OF IMPLIED WARRANTY
**(Asserted on behalf of the Nationwide Class)**

57. Plaintiffs repeat and reallege paragraphs 1 through 56 as if fully stated herein.

58. Defendant is a merchant and was at all relevant times involved in the sourcing, distributing, warranting, and/or selling of the Products. Defendant knew or had reason to know of the specific use for which the Products, as goods, are purchased.

18

59.     Defendant distributed or sold its Products to Class Members.

60.     Defendant provided Plaintiffs and Class Members with implied warranties that the Products are merchantable and fit for the ordinary purposes for which they are used and sold and are not otherwise injurious to consumers.

61.     However, the Products are not fit for their ordinary purpose of providing reasonably safe nourishment to infants because the Products are contaminated with dangerous levels of toxic metals. These dangerously elevated levels render the Products uniquely inappropriate for consumption by highly vulnerable infants.

62.     The dangerous levels of toxins in the Products render them unsafe for infants, their intended consumers. Therefore, the Products are also not merchantable.

63.     Defendant sold the Products directly to consumers

64.     Defendant impliedly warranted that the Products were of merchantable quality and fit for their intended consumption by infants. These implied warranties included, among other things, that Defendant's Products were safe and fit for consumption by infants.

65.     Contrary to the applicable implied warranties, the Products were not fit for the ordinary and intended purpose of providing safe nourishment to infants. Instead, the Products host elevated levels of dangerous toxic metals.

66.     Defendant's sale of dangerous baby food caused the implied warranty to fail in its essential purpose.

67.     Defendant breached the implied warranties because the Products were sold containing dangerous levels of toxic metals, which prevented them from being safe for consumption by infants.

68.     Defendant knew or had a duty to know about the levels of toxins in their own products. Any efforts to limit the implied warranties in a manner that would exclude coverage of the Products is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Products is null and void.

69.     As a direct and proximate result of the foregoing, Plaintiffs and Class Members suffered, and continue to suffer, financial damage and injury, and are entitled to all damages, in addition to costs, interest and fees, including attorneys' fees, as allowed by law.

## COUNT II

### BREACH OF IMPLIED WARRANTY
### Magnuson-Moss Warranty Act
### (Asserted on behalf of the Nationwide Class)

70.     Plaintiffs repeats and realleges paragraphs 1 through 56 as if fully stated herein.

71.     Plaintiffs and Nationwide Class Members are "consumers" as defined in 15 U.S.C. § 2301(3).

72.     Defendant is a "supplier" and "warrantor" as defined in 15 U.S.C. §§ 2301(4) and (5).

73.     The Products are "consumer products" as defined in 15 U.S.C. § 2301(1).

74.     Defendant extended an implied warranty to Plaintiffs and Nationwide Class Members by operation of 15 U.S.C. § 2301(7), and this implied warranty covers the toxins in its Products.

75.     Defendant breached this implied warranty by selling dangerous Products that, due to their contamination with dangerous levels of toxic metals, were neither merchantable nor fit for their intended purpose of providing safe nourishment to infants.

76.     As a direct and proximate result of Defendant's breach of the implied warranty under the Magnuson-Moss Act, Plaintiffs, and the Nationwide Class, have been damaged in an amount to be proven at trial.

## COUNT III

**UNJUST ENRICHMENT/RESTITUTION**
**(Asserted on behalf of the Nationwide Class / Asserted in the**
**Alternative on behalf of the State Subclasses)**

77.     Plaintiffs repeat and reallege paragraphs 1 through 56 as if fully stated herein.

78.     Defendant has been unjustly enriched as a result of the conduct described in this Complaint.

79.     Defendant received a benefit from Plaintiffs and the members of the Nationwide Class and State Subclasses in the form of payment for the Products.

80.     Retention of these benefits by Defendant would be unjust and inequitable because Defendant received these benefits by engaging in the unlawful, unjust, and wrongful acts, omissions, and practices described in this Complaint.

81.     The benefits (or at least some portion the benefits) that Defendant received were not legitimately earned and came at the expense of Plaintiffs and the other members of the Nationwide Class and State Subclasses.

82.     Defendant knew or should have known that the Products can physically harm the infants that they are purchased for, but nonetheless continues to sell the Products without warning.

83.     Defendant's conduct is unjust, inequitable, and wrongful, but systematically engages in this conduct anyway in order to gain unfair advantages and reap unearned financial benefits.

84. There is no justification for Defendant's continued silence as customers purchased the contaminated and dangerous Products.

85. It is therefore against equity and good conscience to permit Defendant to retain the proceeds from its sales of the dangerous Products.

86. Plaintiffs and the Nationwide Class are entitled to restitution and disgorgement of all amounts unjustly retained by Defendant, as well as other appropriate relief.

## COUNT IV

### INDIANA DECEPTIVE CONSUMER SALES ACT
### Indiana Code § 24-5-0.5-1 to 12
### (Asserted on behalf of Plaintiff Hoffman and the Indiana Subclass)

87. Plaintiff Hoffman repeats and realleges paragraphs 1 through 56 as if fully stated herein.

88. The purposes and policies of the Indiana Deceptive Consumer Sales Act (the "DCSA", Indiana Code § 24-5-0.5-1 to -12, are to:

(1) simplify, clarify, and modernize the law governing deceptive and unconscionable consumer sales practices;
(2) protect consumers from suppliers who commit deceptive and unconscionable consumer sales practices; and
(3) encourage the development of fair consumer sales practice.

Ind. Code § 24-5-0.5-1(b).

89. The Indiana General Assembly has instructed courts to construe the DCSA liberally to promote these purposes and policies. Ind. Code § 24-5-0.5-1(a).

90. Defendant is a "supplier" as defined in the DCSA because it is a seller or other person who regularly engages in or solicits consumer transactions, which are defined to include sales of personal property, services, and intangibles that are primarily for a personal, familial, or household purpose, such as those at issue in this action. Ind. Code § 24-5-0.5-2(1), (3).

91.     The DCSA provides that "[a] supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of [the DCSA] whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations." Ind. Code § 24-5-0.5-3(a).

92.     For the reasons discussed herein, Defendant violated and continues to violate the DCSA by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by DSCA § 24-5-0.5-3. Defendant's acts and practices, including its material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

93.     Defendant repeatedly advertised, both on the labels for the Products, on its websites, and through a national advertising campaign, among other items, that the Products were and are safe and healthy for infant and child consumption. Defendant failed to disclose the material information that the Products contained unsafe levels of toxic heavy metals.

94.     Defendant's representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase the Products without being aware that the Products contained unsafe levels of toxic heavy metals. As a direct and proximate result of Defendant's unfair and deceptive acts or practices, Plaintiff Hoffman and Indiana Subclass Members suffered damages by purchasing the Products because they would not have purchased the Products had they known the truth, and they received products that were worthless because they contain unsafe levels of toxic heavy metals.

95. Defendant's misrepresentations and omissions were made knowingly because Defendant was in a position to know, and did in fact know, both where its own Products came from and the contents of its Products.

96. Despite Defendants' knowledge of the issue being supplemented by the Report, Defendants continued to sell the Products to Plaintiff Hoffman and members of the Indiana Subclass.

97. Defendant's deceptive trade practices caused injury in fact and actual damages Plaintiff Hoffman and Indiana Subclass Members in the form of the loss or diminishment of value of the Products Plaintiff Hoffman and Indiana Subclass Members purchased, which allowed Defendant to profit at the expense of Plaintiff Hoffman and Indiana Subclass Members. The injuries to Plaintiff Hoffman and Indiana Subclass Members were to legally protected interests. The gravity of the harm of Defendant's actions is significant and there is no corresponding benefit to consumers of such conduct.

98. The DCSA provides that "[a] person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater. The court may increase damages for a willful deceptive act in an amount that does not exceed the greater of: (1) three (3) times the actual damages of the consumer suffering the loss; or (2) one thousand ($1,000). Ind. Code § 24-5-0.5-4(a)

99. The DCSA provides that "[a]ny person who is entitled to bring an action under subsection (a) on the person's own behalf against a supplier for damages for a deceptive act may bring a class action against such supplier on behalf of any class of persons of which that person is a member . . . ." Ind. Code § 24-5-0.5-4(b).

100.     Plaintiff Hoffman and Indiana Subclass Members seek relief for the injuries they have suffered as a result of Defendant's unfair and deceptive acts and practices, as provided by TDTPA and applicable law.

## COUNT V

**VIOLATIONS OF CALIFORNIA UNFAIR COMPETITION LAW,**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*. (the "UCL")**
**(Asserted on behalf of Plaintiff Sabile and the California Subclass)**

101.     Plaintiff Sabile (the "California Plaintiff") repeats and realleges paragraphs 1 through 56 as if fully stated herein.

102.     The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

103.     The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as alleged herein constitute business acts and practices.

104.     Unlawful:  The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

    a.     The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq*.;

    b.     The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq*.;

    c.     The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100, *et seq*.

105.     Unfair: Defendant's conduct with respect to the labeling, advertising, and sale of the Products was "unfair" because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the gravity of the harm to their victims.

106.     Defendant's conduct with respect to the labeling, advertising, and sale of the Products was and is also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not limited to the applicable sections of the Consumers Legal Remedies Act, the False Advertising Law, and the California Sherman Food, Drug, and Cosmetic Law. Defendant's conduct with respect to the labeling, advertising, and sale of the Products was and is unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumer themselves could reasonably have avoided.

107.     Fraudulent:  A statement or practice is "fraudulent" under the UCL if it is likely to mislead or deceive the public, applying an objective reasonable consumer test.

108.     As set forth herein, Defendant's claims relating the ingredients stated on the Products' labeling and moreover Defendant's representations about quality, ingredient supply, and product manufacturing and oversight, as stated above, are false likely to mislead or deceive the public.

109.     Defendant profited from the sale of the falsely, deceptively, unfairly, and unlawfully advertised and packaged Products to unwary consumers.

110.     The California Plaintiff and Class Members are likely to continue to be damaged by Defendant's deceptive trade practices, because Defendant continues to disseminate misleading information on the Products packaging. Thus, injunctive relief enjoining Defendant's deceptive practices is proper.

111.     Defendant's conduct caused and continues to cause substantial injury to California Plaintiffs and Class members.  The California Plaintiff and Class Members have suffered injury in fact as a result of Defendant's unlawful, unfair, and fraudulent conduct.

112.     In accordance with Bus. & Prof. Code § 17203, the California Plaintiff seeks an order enjoining Defendant from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

113.     The California Plaintiff and Class members also seek an order for and restitution of all monies from the sale of the Products, which were unjustly acquired through acts of unlawful competition.

## COUNT VI

**VIOLATIONS OF CALIFORNIA FALSE ADVERTISING LAW,**
**Cal. Bus. & Prof. Code § 17500 (the "FAL")**
**(Asserted on behalf of Plaintiff Sabile and the California Subclass)**

114.     Plaintiff Sabile repeats and realleges paragraphs 1 through 56 as if fully stated herein.

115.     The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

116.     It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Id.

117.     As alleged herein, the advertisements, labeling, policies, acts, and practices of Defendant relating to the Products misled consumers acting reasonably as to Defendant's representations about quality, ingredient supply, and product manufacturing and oversight, as stated above.

27

118.     The California Plaintiff suffered injury in fact as a result of Defendant's actions as set forth herein because they purchased the Products in reliance on Defendant's false and misleading labeling claims concerning the Products, among other things, quality, ingredient supply, and product manufacturing and oversight, as stated above.

119.     Defendant's business practices as alleged herein constitute deceptive, untrue, and misleading advertising pursuant to the FAL because Defendants have advertised the Products in a manner that is untrue and misleading, which Defendant knew or reasonably should have known, and omitted material information from their advertising.

120.     Defendant profited from the sale of the falsely and deceptively advertised Products to unwary consumers.

121.     As a result, the California Plaintiff, California Class Members, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendant was unjustly enriched.

122.     Pursuant to Cal. Bus. & Prof. Code § 17535, the California Plaintiff, on behalf of members of the California Class, seek an order enjoining Defendant from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

## COUNT VII

**VIOLATIONS OF CALIFORNIA CONSUMER LEGAL REMEDIES ACT,**
**Cal. Civ. Code § 1750, *et seq*. (the "CLRA")**
**(Asserted on behalf of Plaintiff Sabile and the California Subclass)**

123.     Plaintiff repeats and realleges paragraphs 1 through 56 as if fully stated herein.

124.     The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

125.     Defendant's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase and use of the Products for personal, family, or household purposes by the California Plaintiff and Class Members, and violated and continue to violate the following sections of the CLRA:

a.     § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

b.     § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

c.     § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d.     § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

126.     Defendant profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers.

127.     Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

128.     Pursuant to the provisions of Cal. Civ. Code § 1782(a), Plaintiff provided a letter to Defendant with notice of their alleged violations of the CLRA, demanding that Defendant correct such violations, and providing them with the opportunity to correct their business practices. If Defendant does not thereafter correct their business practices, Plaintiffs will amend

(or seek leave to amend) the complaint to add claims for monetary relief, including restitution and actual damages under the Consumers Legal Remedies Act.

129.     Pursuant to California Civil Code § 1780, The California Plaintiff seeks injunctive relief, reasonable attorney fees and costs, and any other relief that the Court deems proper.

## COUNT VIII

**VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW § 349**
**(N.Y. Gen. Bus. Law § 349)**
**(Asserted on behalf of Plaintiff Oshier and the New York Subclass)**

130.     Plaintiff Oshier repeats and realleges paragraphs 1 through 56 as if fully stated herein.

131.     Plaintiff Oshier brings this claim individually and on behalf of the proposed New York Subclass against Defendant.

132.     Plaintiff Oshier and New York Subclass members are "persons" within the meaning of the New York General Business Law ("GBL"). N.Y. Gen. Bus. Law § 349(h).

133.     Defendant is a "person, firm, corporation or association or agent or employee thereof" within the meaning of the GBL. NY. Gen. Bus. Law § 349(b).

134.     Under GBL section 349, "[d]eceptive acts or practices in the conduct of any business, trade or commerce" are unlawful.

135.     In the course of Defendant's business, it failed to disclose and actively concealed the presence of elevated levels of toxic metals in the Products—with the intent that consumers rely on that concealment in deciding whether to purchase the Products.

136.     By intentionally concealing the elevated levels of toxic metals contained within while advertising the Products as appropriate for consumption by infants, Defendant engaged in deceptive acts or practices in violation of GBL section 349.

137.    Defendant's deceptive acts or practices were materially misleading. Aldi's conduct was likely to and did deceive reasonable consumers, including Plaintiff Oshier, about the true characteristics and value of the Products.

138.    Plaintiff Oshier and New York Subclass members were unaware of, and lacked a reasonable means of discovering, the material facts that Aldi suppressed.

139.    Aldi's actions set forth above occurred in the conduct of trade or commerce.

140.    Defendant's misleading conduct concerns widely purchased consumer products and affects the public interest. Aldi's conduct includes unfair and misleading acts or practices that have the capacity to deceive consumers and are harmful to the public at large.

141.    As a result of this omission, Plaintiff Oshier and members of the New York Subclass have suffered economic injury because (a) they would not have purchased the Products had they known the truth, and (b) they overpaid for the Products on account of the above-stated omissions.

142.    Plaintiff Oshier and New York Subclass members suffered ascertainable loss as a direct and proximate result of Aldi's GBL violations. Plaintiff Oshier and New York Subclass Members are entitled to recover their actual damages or $50, whichever is greater. Additionally, because Aldi acted willfully or knowingly, Plaintiff Oshier and New York Subclass members are entitled to recover three times their actual damages. Plaintiff is also entitled to reasonable attorney's fees.

## COUNT IX

**VIOLATION OF THE NEW YORK GENERAL BUSINESS LAW § 350**
**(N.Y. Gen. Bus. Law § 350)**
**(Asserted on behalf of Plaintiff Oshier and the New York Subclass)**

143.     Plaintiff Oshier repeats and realleges paragraphs 1 through 56 as if fully stated herein.

144.     Plaintiff Oshier brings this claim individually and on behalf of the proposed New York Subclass against HP.

145.     N.Y. Gen. Bus. Law § 350 provides, in part, as follows: False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful.

146.     N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

> The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual …

147.     Aldi's labeling and advertisements of the Products were false and misleading in a material way, via affirmative statements and omissions as Aldi failed to reveal material facts in light of such representations or conduct.

148.     Specifically, Aldi advertised the Products as being age-appropriate for infants, although the elevated levels of toxic metals contained within demonstrates otherwise. This misrepresentation has resulted in consumer injury or harm to the public interest.

149.     As a result of this misrepresentation, Plaintiff Oshier and members of the New York Subclass have suffered economic injury because (a) they would not have purchased the Products had they known the truth, and (b) they overpaid for the Products on account of the above-stated misrepresentations and omissions.

150.     By reason of the foregoing and as a result of Aldi's conduct, Plaintiff Oshier and the New York Subclass seek to enjoin the unlawful acts and practices described herein, to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully requests that this Court:

A. Certify the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Name Plaintiffs as Class Representatives of the Classes;

C. Name Plaintiffs' counsel as Class Counsel for the Classes;

D. Award damages, including compensatory, exemplary, and statutory damages, to Plaintiff and the Classes in an amount to be determined at trial;

E. Permanently enjoin Defendant from engaging in the wrongful and unlawful conduct alleged herein;

F. Award Plaintiffs and the Class Members their expenses and costs of suit, including reasonable attorneys' fees to the extent provided by law;

G. Award Plaintiffs and the Class Members pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law; and

H. Award such further relief as the Court deems appropriate.

Dated: May 28, 2024           Respectfully submitted,

           By: */s/ Katrina Carroll*
           Katrina Carroll
           **LYNCH CARPENTER LLP**
           111 W. Washington Street
           Suite 1240
           Chicago, IL  60602
           Phone: (312) 750-1265
           Fax: (312) 212-5919
           katrina@lcllp.com

           **MIGLIACCIO & RATHOD LLP**
           Nicholas A. Migliaccio *
           nmigliaccio@classlawdc.com
           Jason S. Rathod *
           jrathod@classlawdc.com
           Mark D. Patronella *
           mpatronella@classlawdc.com
           412 H Street NE, Suite 302
           Washington, D.C. 20002
           Tel: (202) 470-3520

           **KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**
           Gary Graifman*
           ggraifman@kgglaw.com
           Melissa R. Emert*
           memert@kgglaw.com
           135 Chestnut Ridge Road, Suite 200
           Montvale, NJ 07645
           Tel: (845) 356-2570
           F: (845) 356-4335

           Counsel For Plaintiffs and the Proposed Class

           * *pro hac vice* admission to be sought